IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| OTIS G. WALKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| vs. | : | |
| | : | NO. 1:09-CV-2550-WSD |
| UNITED STATES POSTAL SERVICE | : | |
| and AMERICAN POSTAL WORKERS | : | |
| UNION, AFL-CIO, ATLANTA METRO, | : | |
| AREA LOCAL 32, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

COMES NOW Defendant, the United States Postal Service (the "USPS"), and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 hereby files its Statement of Undisputed Material Facts, showing the Court as follows:

1.

In August 2006, Plaintiff Otis Walker ("Plaintiff") was an employee of the USPS. At the time, he worked as a Sales Associate at the Pharr Road Postal Store ("Pharr Road"). Complaint at ¶¶ 7-8. Plaintiff worked at Pharr Road from 2000 through August 2006. Deposition of Plaintiff Otis Walker ("Plaintiff Dep.") at 23.[1]

---

[1] A true and correct copy of Plaintiff Otis Walker's deposition is attached as <u>Exhibit 1</u>.

2.

On or about February 2, 2005, Plaintiff tore his pectoral muscle while working out at Crunch Gym Fitness Center ("Crunch Gym"). Plaintiff Dep. at 24-28. As a result, Plaintiff underwent surgery to repair this injury. Plaintiff Dep. at 28. Plaintiff was therefore on sick leave from the USPS and did not return to work until April 2005. Plaintiff Dep. at 31.

3.

Plaintiff reinjured his arm in or around June 2005. Plaintiff Dep. at 31. Plaintiff's physician ordered that he could return to light-duty work on July 16, 2005 or that he could return to fully duty on August 16, 2005. Plaintiff Dep. at 35.

4.

Between June and July 2005, while Plaintiff was on sick leave status, he did not make a request for light duty work to any of his supervisors. Plaintiff Dep. at 54.

5.

At no time did Plaintiff ever make a written request for light duty work. Plaintiff Dep. at 255; Deposition of Carl Hudson ("Hudson Dep.") at 24, 50-51.[2]

_____

[2] A true and correct copy of Carl Hudson's deposition transcript is attached as Exhibit 2.

6.

USPS policy requires requests for light duty work to be made in writing.  Hudson Dep. at 61-62.

7.

Plaintiff remained on sick leave status with the USPS from June 2005 through August 16, 2005 and received his full salary from the USPS during this time.  Plaintiff Dep. at 41-42.

8.

From June 2002 until August 16, 2002, in addition to being employed full time by the USPS, Plaintiff had a part-time job at the Fairfield Inn & Suites, Marriott Hotel (the "Fairfield Inn"). Plaintiff Dep. at 35.

9.

While on paid sick leave status from the USPS from June 2002 until August 16, 2002, Plaintiff worked at the Fairfield Inn. Plaintiff Dep. at 35, 55; August 8, 2006 Notice of Removal ("Second Notice of Removal") attached to Complaint as Exhibit A. As discussed below, this was in direct violation of USPS policy. See Complaint at ¶ 25, Exhibit B-4 (discussing ELM, Section 513.312).

10.

In early 2006, Supervisor Emma Walker ("Supervisor Walker") began working at Pharr Road.  Supervisor Walker, like the other

supervisors assigned to Pharr Road, was assigned to more than one location and, therefore, was not at Pharr Road on a full-time basis.  Plaintiff Dep. at 252 (stating that a supervisor was not always at the Pharr Road location, as the supervisors "would go back and forth" to different locations).

11.

Supervisor Walker was moved to Pharr Road because her manager was concerned Plaintiff was not "in the building at the time that he was supposed to be there," such that Supervisor Walker was requested to monitor the situation.  Deposition of Emma Walker ("Emma Walker Dep.") at 8-9, 14-15.[3]

12.

In April 2006, Plaintiff suffered an injury from a freezer ice pack.  Plaintiff Dep. at 61.

13.

As a result of this injury, Plaintiff needed to take sick leave from the USPS.  Plaintiff Dep. at 64.

14.

At the time, Supervisor Walker offered Plaintiff light duty work.  Emma Walker Dep. at 22-23.  Plaintiff declined

---

[3] A true and correct copy of Supervisor Emma Walker's deposition transcript is attached hereto as Exhibit 3.

Supervisor's Walker's offer for light duty work and, instead, opted to take paid sick leave.  <u>Id.</u>

15.

Supervisor Walker specifically warned Plaintiff that USPS policy prohibited him from working his second, part-time job while on sick leave status from the USPS.  Plaintiff Dep. at 62 ("she did say I shouldn't work -- I better not work my part-time job if I'm out on sick leave."); Emma Walker Dep. at 18.

16.

Based on Supervisor Walker's warning, Plaintiff knew or reasonably should have known that USPS policy prohibited USPS employees from working at another job while on sick leave status from the USPS.  <u>See</u> Plaintiff Dep. at 62; Emma Walker Dep. at 18.

17.

At no time did Plaintiff submit "a written request to anyone requesting authorization to work at the Fairfield Inn" while on paid sick leave from the USPS.  Plaintiff Dep. at 252-53.

18.

While Plaintiff claims supervisors Lynette Bailey and Supervisor Walker were aware that he had a second job at the Fairfield Inn, he admits that they were not aware that he was working at that second job while on paid sick leave status from the USPS.  Plaintiff Dep. at 253.

19.

Supervisor Ron Manson did not know Plaintiff had a second, part-time job.  Plaintiff Dep. at 210.

20.

In fact, none of Plaintiff's supervisors were aware that he was working at the Fairfield Inn while on paid sick leave status from the USPS.  Hudson Dep. at 55-56; Plaintiff Dep. at 176.

21.

Instead, Plaintiff admits that Supervisor Walker warned him that he better "not be working [his] part-time job" while on paid sick leave status with the USPS.  Plaintiff Dep. at 254; see also id. at 62 ("she did say I shouldn't work -- I better not work my part-time job if I'm out on sick leave.").

22.

Despite Supervisor Walker's warning to Plaintiff and, consequently, Plaintiff's undisputable knowledge of the USPS's prohibition against working at another job while on paid sick leave status, following this warning, Plaintiff worked at the Fairfield Inn on April 15, 2006, while on paid sick leave status from the USPS for his freezer pack injury/burn.   Complaint at Exhibit A-2.

23.

Plaintiff admits he did not have any complaints about or problems with Supervisor Walker until she initiated an investigation against him.  Plaintiff Dep. at 57 ("we was always professional friends"); 58-59; 255-56 (stating that prior to Supervisor Walker's initiating an investigation, the two got along "Beautiful[ly]," that "she had reasonable expectations for [Plaintiff] as an employee," that she was "fair," and that Plaintiff "didn't have any complaints about her.").

24.

Upon learning of the investigation, Plaintiff felt the USPS and Supervisor Walker were "blowing this out of proportion." Plaintiff Dep. at 70.

25.

Bruce Watkins, a friend of Plaintiff (Plaintiff Dep. at 71), reported that Plaintiff told him "'If they fire me, I will blow them away!'"  Plaintiff Dep. at Exhibit 3 (hereinafter "First Notice of Removal"); see Emma Walker Dep. at 32, 38-39.

26.

Plaintiff knew the USPS had a "Zero Tolerance" policy for threats.  Plaintiff Dep. at 77.  Moreover, he agrees the USPS should take threats of bodily harm seriously.  Plaintiff Dep. at 245.

27.

Based on the USPS's investigation into Plaintiff's terroristic threat to "blow" his supervisors away, Plaintiff contacted the Union.  Plaintiff Dep. at 78-79.

28.

The Union is a local labor organization affiliated with Defendant American Postal Workers Union, AFL-CIO, and serves as the exclusive collective bargaining representative of all clerks, maintenance, motor vehicle, and material support unit Postal Service employees.  See Collective Bargaining Agreement Between the American Postal Workers Union (APWU), AFL-CIO, and the U.S. Postal Service (hereinafter "CBA"), Article 15.5.A.6.[4]

29.

The CBA contains a multi-step grievance-arbitration procedure to resolve disputes arising out of application or interpretation of the Agreement.  See CBA, Article 15.  Under the CBA, a Union representative or employee who feels aggrieved may initiate a grievance.  Id.  If a grievance is not resolved at Step 1, the Union may appeal to Step 2.  Id.  If the USPS denies a grievance at Step 2, the Union may appeal the grievance to Step

---

[4]     A true and correct copy of the relevant portions of the CBA are attached to the Declaration of Richard Norcross ("Norcross Dec."), which is attached as Exhibit 4.

3.  <u>Id.</u>  Alternatively, the CBA provides that certain grievances may be directly appealed to arbitration if not resolved at Step 2.  <u>Id.</u>  At all stages of the grievance procedure, the Union is authorized to "settle or withdraw the grievance in whole or in part."  <u>Id.</u>

30.

In light of Plaintiff's terroristic threat to "blow" his supervisors away, the USPS's resulting investigation, and the CBA, Plaintiff met with Malinda Hunter ("Union Rep. Hunter"), a Union representative.  The two met for "as long as it took."  Plaintiff Dep. at 82.  At the time, Union Rep. Hunter took down the complaint and "started the Union investigation."  Plaintiff Dep. at 82-83.

31.

As a result of this terroristic threat and the USPS "Zero Tolerance" policy, on June 12, 2006, the USPS placed Plaintiff on Emergency Placement and issued a Notice of Removal to Plaintiff.  First Notice of Removal.

32.

The First Notice of Removal "is not the subject of the instant action."  Complaint at ¶ 22.

33.

Throughout the investigation into the First Notice of Removal, Union Rep. Hunter actively worked on Plaintiff's behalf and was "instrumental" in representing Plaintiff in this process. Plaintiff Dep. at 102.

34.

As a result of Union Rep. Hunter's advocacy, requests, and representation on Plaintiff's behalf, the First Notice of Removal was settled, and Plaintiff received back pay.  Plaintiff Dep. at 102-03.

35.

In agreeing to settle Plaintiff's grievance related to the terroristic threats made against management, it was understood that neither party waived its position as outlined in the grievance.  See Emma Walker Dep. at 44.

36.

As a result of safety concerns related to the terroristic threat made against Supervisor Walker, Supervisor David Corey ("Supervisor Corey") took over the handling of all investigations related to Plaintiff, including responding to Union inquiries. Emma Walker Dep. at 60; Hudson Dep. at 76.

37.

Supervisor Corey is the person who brought formal charges against Plaintiff, including issuing the First and Second Notices of Removal to Plaintiff.  Hudson Dep. at 63-64; Plaintiff Dep. at Exhibits 3, 6.

38.

On August 8, 2006, Plaintiff was issued a Second Notice of Removal.  Complaint at ¶ 25, Exhibit A.

39.

Plaintiff's Second Notice of Removal contained two charges: (1) "Unacceptable Conduct" arising out of the allegations that Plaintiff left Pharr Road to work out at Crunch Gym during working hours and without clocking out (hereinafter "Charge #1"); and (2) "Improper Conduct" arising out of the allegation that Plaintiff engaged in other gainful employment while on paid sick leave status with the USPS in contravention of the Employee and Labor Relations Manual (the "ELM") (hereinafter "Charge #2"). Complaint at ¶ 25, Exhibit A, Exhibit B.

40.

With regard to Charge #2, the USPS's Second Notice of Removal was based on the USPS's finding that Plaintiff worked as a Front Desk Clerk at the Fairfield Inn on the same dates that he was on paid sick leave from the USPS.  Complaint at Exhibit A.

11

41.

More specifically, the USPS determined that a comparison of payroll records from Fairfield Inn and Time and Attendance records from the USPS confirmed that Plaintiff was paid sick leave while he also received earnings from Fairfield Inn on: 6/21/05, 6/22/05, 6/27/05, 6/28/05, 6/29/05, 7/2/05, 7/7/05, 7/9/05, 7/14/05, 7/16/05, 7/19/05, 7/21/05, 7/23/05, 7/26/05, 8/6/05, 8/9/05, 8/13/05, and 4/15/06.  Complaint at Exhibit A.

42.

The April 15, 2006 violation took place after Supervisor Walker had specifically warned Plaintiff that it was a violation of USPS policy to work a second job while on sick leave status with the USPS.  Emma Walker Dep. at 18; Plaintiff Dep. at 62; see Complaint at Exhibit A.

43.

Section 513.312 of the ELM provides "an employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority." Complaint at ¶ 25, Exhibit B-4.

44.

Section 665.3 of the ELM states that, "employees must cooperate in any postal investigation, including Office of

Inspector General investigations."  Complaint at ¶ 25, Exhibit B-4.

45.

Throughout the USPS investigation of the Second Notice of Removal, Plaintiff was uncooperative, refusing to answer questions posed to him.  Complaint at ¶ 24, B3-B-4 (stating that on May 30, 2006, when Plaintiff and his Union representative met with USPS investigators, Plaintiff "refused to answer any questions"); B-4 (stating that when a supervisor initially spoke with Plaintiff regarding working another job on USPS time, Plaintiff responded that this was "'something I have to do and don't mess with my money'" and that on July 18, 2008, when Plaintiff met with USPS investigators, "he chose not to answer any question"); B-8 (stating Plaintiff "was evasive and less than forth coming in his response as to why he engaged in gainful employment while in a sick leave status").

46.

Where, as here, a USPS employee may incriminate himself by answering questions, the Union may advise that employee not to answer certain question based on the right against self-incrimination.  Hudson Dep. at 38; <u>see</u> Plaintiff Dep. at 206 (agreeing that "it's logical that the Union would have told [Plaintiff] not to incriminate [himself] by answering yes" with

13

regard to whether he had worked a second job while collecting sick leave).

47.

While Plaintiff's failure to cooperate in the investigation was in violation of ELM Section 665.3, the Arbitrator ultimately concluded that "Had [Plaintiff] answered the questions and cooperated in the investigation, it would not have changed the facts as presented and as he testified to."  Complaint at B-19; see also Hudson Dep. at 40.

48.

Following the issuance of the Second Notice of Removal, Defendant American Postal Workers Union, AFL-CIO (the "Union") filed a grievance on Plaintiff's behalf.  Complaint at ¶ 26. Union Rep. Hunter filed this grievance in an effort to get Plaintiff back to work.  Plaintiff Dep. at 118.

49.

As part of this grievance process, Plaintiff was interviewed on May 30, 2006, at which time he was represented by Union Rep. Hunter.  Plaintiff Dep. at 114.

50.

Another interview was held on July 18, 2006, and Union Rep. Hunter again was present and represented Plaintiff at this interview.  Plaintiff Dep. at 116-17.

51.

After Plaintiff received the Second Notice of Removal, Union Rep. Hunter "was out there gathering information on [his] behalf and representing [Plaintiff] zealously," to the best of her ability.  Plaintiff Dep. at 117-18.

52.

At Step 1 of the grievance process, Union Rep. Hunter met with Supervisor Walker.  Plaintiff Dep. at 119-20, Exhibit 7.

53.

Union Rep. Hunter went on to file a Step 2 Appeal Grievance Form.  Plaintiff Dep. at 119-21, 129, Exhibit 7.

54.

Union Rep. Hunter also requested additional documents relative to processing Plaintiff's grievance related to his Second Notice of Removal.  Plaintiff Dep. at 125-27, Exhibit 8.

55.

Both Union Advocate Ralph Brown ("Vice President Brown"), who, at the time, was the Vice President of Plaintiff's Union chapter, and Union Rep. Hunter helped Plaintiff during the Step 2 process.  Plaintiff Dep. at 134.

56.

In proceeding with the grievance process, the Union presented "very compelling arguments on [Plaintiff's] behalf." Plaintiff Dep. at 122.

57.

Based on the seriousness of Plaintiff's actions, the USPS again denied the grievance at Step 2.  Plaintiff Dep. at 134; Complaint at ¶ 26.

58.

The Postal Service denied Plaintiff's appeals and the matter was referred to arbitration.  Complaint at ¶ 26; Plaintiff Dep. at 140, Exhibit 10.

59.

The sole issue for which this matter was submitted to arbitration was whether the USPS issued the Second Notice of Removal for just cause in accordance with Article 16 of the Collective Bargaining Agreement.  Complaint at Exhibit B-2.

60.

Plaintiff and his Union representatives, Vice President Brown and Union Rep. Hunter, were in ongoing contact and "were going back and forth up until the [first] arbitration." Plaintiff Dep. at 138-39.

61.

Plaintiff spoke with Union Rep. Hunter "regularly" – "at least once a week."  Plaintiff Dep. at 139; see also Plaintiff Dep. at 143.  Moreover, he never had a problem getting in touch with Union Rep. Hunter.  Plaintiff Dep. at 140.

62.

The arbitration process was explained to Plaintiff, as was the strategy for arbitration.  Plaintiff Dep. at 142, 144.

63.

Two arbitrations were held.  No result was reached following the first arbitration because the first arbitrator became ill. Complaint at ¶ 27; Plaintiff Dep. at 147.  Nevertheless, at this arbitration, Plaintiff was represented by Vice President Brown. Complaint at ¶ 27; Plaintiff Dep. at 146.  Vice President Brown presented Plaintiff's case, calling Plaintiff and Union Rep. Hunter to testify.  Plaintiff Dep. at 146.

64.

Between Plaintiff's first and second arbitration hearing, Union elections were held, and new Union representatives were elected.  Plaintiff Dep. at 150-51.  As a result, Union Rep. Hunter returned to her position working on the floor as a USPS clerk.  Plaintiff Dep. at 150.  In addition, Vice President Brown

retired and was, therefore, no longer with the Union.  Plaintiff
Dep. at 155-56; Hudson Dep. at 19.

65.

The Union continued to be in contact with Plaintiff in
between the two arbitrations.  Plaintiff "kept going to the
Union" office, and he spoke with Kenneth Beasley, the Union
President.  Plaintiff Dep. at 154.

66.

As a result of Vice President Brown's retirement and Union
elections, and in preparation for the second arbitration, Union
Advocate Carl Hudson ("Advocate Hudson") took over Plaintiff's
case.  Hudson Dep. at 17-19.

67.

Advocate Hudson was assigned to Plaintiff's case in the
later part of 2008 and had "[a] few months" to prepare for
arbitration.  Hudson Dep. at 20.

68.

This is the "typical" amount of time Advocate Hudson
generally has to prepare for arbitration.  Hudson Dep. at 20.

69.

At the time he was assigned to Plaintiff's case, Advocate
Hudson was an experienced Union advocate, having more than 13
years of experience representing USPS employees at arbitration.

18

Hudson Dep. at 7.  Advocate Hudson was locally and nationally certified to handle arbitrations on behalf of the Union and had handled 15 to 20 local and national arbitrations a year since 1995.  Hudson Dep. at 10-11, 14-15.

70.

Plaintiff met with Advocate Hudson "a couple times" prior to arbitration.  Plaintiff Dep. at 157.  One meeting lasted "several hours."  Plaintiff Dep. at 157.  Plaintiff described his "whole case" to Advocate Hudson, and the two "discussed all the documents and evidence that's been collected and that was presented at the other arbitration hearing."  Plaintiff Dep. at 159.

71.

In addition to going through Plaintiff's case, Plaintiff and Advocate Hudson discussed arbitration strategy.  Plaintiff Dep. at 161.

72.

In preparation for arbitration, Advocate Hudson also spoke with Vice President Brown to obtain Vice President Brown's knowledge regarding Plaintiff's grievance and the first arbitration, as well as to get Vice President Brown's assessment and impressions of the matter.  Hudson Dep. at 76.

73.

Advocate Hudson spent "well over 24 hours" – likely "24 to 48 hours" preparing for arbitration.  Hudson Dep. at 22-23.  This included spending 8 hours "the night before [arbitration] alone."  Hudson Dep. at 22.

74.

Prior to the second arbitration, while Plaintiff had questions, Plaintiff felt "confident" that Advocate Hudson was going to "do the best he could" on Plaintiff's behalf.  Plaintiff Dep. at 160.

75.

A second arbitration was held January 6, 2009 before Arbitrator Joseph S. Cannavo ("Arbitrator Cannavo").  At this second arbitration, Plaintiff was represented Advocate Hudson. Complaint at ¶ 28.

76.

Advocate Hudson was prepared to present at arbitration. Plaintiff Dep. at 189.

77.

The USPS presented testimony from several witnesses at the second arbitration, including Supervisor Walker, Supervisor Corey, and Special Agent with the Office of Inspector General,

Nick Ivanovic.  Plaintiff Dep. at 163, Exhibit 12; Hudson Dep. at
40.

78.

The USPS also presented "paperwork" and evidence that
demonstrated that Plaintiff worked at the Fairfield Inn on the
dates listed in the Second Notice of Removal.  Plaintiff Dep. at
168; see Complaint at Exhibit B.

79.

The Union presented testimony from Plaintiff and former Vice
President Brown.  Plaintiff Dep. at Exhibit 12.

80.

Advocate Hudson opted not to call character witnesses on
Plaintiff's behalf based on his communications with Union Steward
Mateo Smith ("Steward Smith"), who was the Union Steward assigned
to Pharr Road.  Hudson Dep. at 58-59.  Steward Smith told
Advocate Hudson that the charges brought against Plaintiff were
true – that Plaintiff, in fact, had been going to Crunch Gym
without clocking out and had been working at the Fairfield Inn
while on sick leave status "for quite some time," and that
personnel at Pharr Road were aware of this.  Hudson Dep. at 58-
59.  Based on this information, Advocate Hudson was concerned
that presenting character witnesses from Pharr Road would hurt
Plaintiff's case at arbitration.  Hudson Dep. at 59 ("I was

21

concerned that they would more so add more weight on the case itself, not favorable to the grievant.")

81.

While Advocate Hudson did not call character witnesses, per se, at the second arbitration, character evidence was presented. More specifically, on cross examination by Advocate Hudson, Supervisor Walker opined that when Plaintiff was actually at his terminal and was working, he was a good employee.  Hudson Dep. at 72-73; see Emma Walker Dep. at 14 (opining that when Plaintiff was at his work station, Supervisor Walker was "pleased with his performance").

82.

In addition, at arbitration, Plaintiff provided testimony about his character and the type of employee he was.  Plaintiff Dep. at 189.  More specifically, Plaintiff testified about his 18 years of good service and the good work he did for the USPS during that time.  Plaintiff Dep. at 189.

83.

Advocate Hudson was aware that Plaintiff had, in fact, worked at the Fairfield Inn while on sick leave status from the USPS in violation of ELM Section 513.312 and as charged in the Second Notice of Removal.  Hudson Dep. at 52, 55.

22

84.

Because Plaintiff committed all of the offenses charged in the Second Notice of Removal, the only issue at arbitration was one of "mitigation."  Hudson Dep. at 71 ("[Plaintiff stated he did everything that the charges itself said.  The other part was just the mitigation on those.").

85.

While Plaintiff now complains that character witnesses could have been called at the second arbitration, those witnesses would only have spoken to mitigation – not to the underlying charges against Plaintiff, particularly as Plaintiff admitted Charge #2. Plaintiff Dep. at 212-13 ("the character witnesses would just -- again, had nothing to do with the charges, per se.  They just would help you show that [Plaintiff was] a good employee").

86.

At the second arbitration, the USPS met its burden of proof with respect to proving Charge #2.  Complaint at Exhibit B.

87.

Plaintiff "did not deny working at the hotel while on sick leave" status with the USPS.  Complaint at Exhibit B-15; see Plaintiff Dep. at 171.

88.

In fact, when questioned by Arbitrator Cannavo as to whether he had worked at the Fairfield Inn on some or all of the dates charged, Plaintiff admitted that he had.  Plaintiff Dep. at 169, 171.

89.

On the dates in question, Plaintiff was on leave from the USPS, was being paid by the USPS for that time, and told the arbitrator such.  Plaintiff Dep. at 170.

90.

At the second arbitration, while Plaintiff admitted working at the Fairfield Inn while on sick leave with the USPS, he claimed he was not aware that USPS policy prohibited this. Plaintiff Dep. at 170, 171.

91.

Despite this claim, Plaintiff knew that the USPS had rules and regulations that he was required to follow.  Plaintiff Dep. at 250-51.

92.

Plaintiff was aware that he was charged with complying with the ELM as an employee of the USPS.  Plaintiff Dep. at 264.

93.

Plaintiff's supervisors did not at any time give him permission to work a second job while on leave from the USPS. Plaintiff Dep. at 176, 268.

94.

Plaintiff is aware he violated the ELM and USPS policy. Plaintiff Dep. at 278-79.

95.

Arbitrator Cannavo concluded that, because Plaintiff was a long-term employee of the USPS, "it is reasonable to conclude" that Plaintiff had notice of the prohibition against employees working at another job while on sick leave status.  In further support of this conclusion, Arbitrator Cannavo considered the fact that, if, as Plaintiff claims, he "truly be believed that he could be on sick leave and work another job, he would have told Management what he was doing.  The fact that he did not indicates that he knew this was wrong."  Complaint at Exhibit B-16.

96.

Arbitrator Cannavo credited the testimony of Supervisor Walker, who testified at arbitration that "she made several open and notorious efforts to get the [Plaintiff] to stop using Postal time to work at his second job."  Complaint at Exhibit B-16.

97.

For example, in April 2005, when Plaintiff was on sick leave status with the USPS based on a burn he received from an ice pack, Supervisor Walker specifically warned Plaintiff that he was prohibited from working a second job while on sick leave status. Plaintiff Dep. at 62, 254.  Despite this warning, records demonstrate that Plaintiff worked at the Fairfield Inn on April 15, 2006 while on paid sick leave status with the USPS. Complaint at Exhibit A-2 and B-16.

98.

Supervisor Walker's testimony at arbitration was unrebutted. Complaint at Exhibit B-16 ("Thus, if the [Plaintiff] truly did not have prior notice of the prohibition against working a second job while on sick leave, he certainly had sufficient notice to correct the situation, given Supervisor Walker's credible and unrebutted testimony.").

99.

Arbitrator Cannavo issued a final ruling affirming the USPS decision to remove Plaintiff.  Complaint at ¶ 29, Exhibit B.

100.

More specifically, Arbitrator Cannavo found that the evidence with respect to Charge #1 was insufficient to sustain

the Notice of Removal, but that the USPS met its burden of proof
with respect to Charge #2.  Complaint at ¶ 29.

101.

Because Arbitrator Cannavo found that the evidence with
respect to Charge #1 was insufficient to sustain the Notice of
Removal, Arbitrator Cannavo did not rely on Charge #1 in denying
Plaintiff's grievance.  Complaint at B-14-B-19; Plaintiff Dep. at
204-05.

102.

While Plaintiff now complains about the Union's failure to
obtain Point of Sale ("POS") reports, the POS reports would speak
only to Charge #1, which Arbitrator Cannavo did not rely upon in
sustaining the Second Notice of Removal.  Complaint at B-14-B-19;
Second Notice of Removal; Hudson Dep. at 54.  The POS report
would not speak to or have any bearing on Charge #2, particularly
as Plaintiff admitted the allegations set forth in Charge #2.
Plaintiff Dep. at 277; Hudson Dep. at 54.

103.

Moreover, while Arbitrator Cannavo found there was
insufficient evidence regarding Charge #1, Plaintiff admits that
he left work to work out at Crunch Gym without clocking out from
the USPS.  Plaintiff Dep. at 259-60.  Plaintiff "assumed" his
supervisors were aware he was doing this, though he never

discussed it with his supervisors or obtained permission to do so.  Plaintiff Dep. at 259.  Further, Plaintiff was aware that USPS policy required employees to clock in and clock out when they left the building.  Plaintiff Dep. at 260.

104.

Based on the foregoing admissions, there was ample evidence to support the USPS burden of proof with respect to Charge #1.

105.

In support of his arbitration decision, Arbitrator Cannavo cited several cases that support the proposition that the USPS properly removed Plaintiff for working a second job while on sick leave status.  Complaint at Exhibit B-17-B-18.

106.

These cases support the proposition that, under the applicable CBA, the USPS need not provide progressive discipline to an employee who fraudulently requests and takes sick leave and then subsequently works a second job.  Complaint at B-17-B-18.

107.

These cases also support the assertion that an employee's length of service is not a mitigating factor in such a situation. Complaint at B-17-B-18.

108.

Following the second arbitration, Plaintiff never complained to Advocate Hudson that he did not like something Advocate Hudson did at arbitration.  Plaintiff Dep. at 178.  Nor did Plaintiff talk to Advocate Hudson about something else Advocate Hudson could have done.  Plaintiff Dep. at 179.

109.

At the second arbitration, Advocate Hudson seemed to know what he was doing.  Plaintiff Dep. at 187.

110.

Plaintiff wanted the ultimate outcome from arbitration to be different and wanted to return to work at the USPS (Plaintiff Dep. at 177), and he thought he was going to get his job back. Plaintiff Dep. at 223-24.

111.

Plaintiff's opinion regarding the Union's performance is based on the outcome – not the efforts taken by the Union, the arguments asserted, or the underlying grievance process. Plaintiff Dep. at 177.  Had the outcome been different and Plaintiff been permitted to return to work, the Union and Advocate Hudson "would have done a wonderful job; if I'm not back to work, then I guess not."  Plaintiff Dep. at 177, see also Plaintiff Dep. at 279-80 ("if the outcome had been different and

29

the arbitrator had found otherwise," it is "fair to say" that Plaintiff would have been pleased with the Union).

112.

The sole basis for Plaintiff's claim that the Union in any way acted dishonestly is that Plaintiff was led to believe he had a chance of winning his grievance and that he might return to work.  Plaintiff Dep. at 224-25, 228.

113.

While the Union did not succeed in getting Plaintiff back to work at the USPS, they did work hard to get Plaintiff his job back.  Plaintiff Dep. at 229.

114.

The sole basis for Plaintiff's claim that the Union acted in bad faith is the Union's failure to obtain Plaintiff's POS reports.  Plaintiff Dep. at 225.

115.

As set forth above, the POS reports relate solely to Charge #1, which Arbitrator Cannavo did not rely on in denying Plaintiff's grievance.  Complaint at B-14-B-19; Plaintiff Dep. at 204-05.  The POS reports would not in any way disprove the allegations set forth in Charge #2 – charges admitted by Plaintiff – which formed the basis of Arbitrator Cannavo's

decision to uphold Plaintiff's termination.  Plaintiff Dep. at
277.

117.

No one from the Union at any time discriminated against
Plaintiff in any way.  Plaintiff Dep. at 228, 230.

117.

In representing and advocating on Plaintiff's behalf as a
Union representative, Union Rep. Hunter at all times "did a good
job" and proceeded zealously on Plaintiff's behalf.  Plaintiff
Dep. at 223.

118.

In representing and advocating on Plaintiff's behalf as a
Union representative, Advocate Hudson "did all he could do."
Plaintiff Dep. at 223.

119.

In representing Plaintiff on behalf of the Union, Advocate
Hudson at all times acted in good faith.  Hudson Dep. at 59-60.

120.

In representing Plaintiff on behalf of the Union, Advocate
Hudson did not at any time act in a discriminatory manner.
Hudson Dep. at 60.

121.

In representing Plaintiff on behalf of the Union, Advocate Hudson did not at any time act in a perfunctory manner.  Hudson Dep. at 60.

122.

The Union at all times provided Plaintiff with fair representation, advocating on his behalf at each step in the grievance process related to both the First Notice of Removal and Second Notice of Removal.  See generally, Plaintiff Dep.

123.

The USPS treated its investigation of Plaintiff and the charges brought against him "[A]bout the same" as other cases – not more or less harshly.  Hudson Dep. at 47.

124.

While the USPS has a policy of employing "progressive discipline," certain offenses are terminable.  Plaintiff Dep. at 274; Hudson Dep. at 57.

125.

The USPS considers theft to be a terminable offense where progressive discipline is not used.  Hudson Dep. at 57.

126.

In the USPS, all cases that relate to "stealing time" or "theft" generally go straight to removal and termination.  Hudson

Dep. at 49-50.  Further, stealing, theft, lying, and dishonesty
are all terminable offenses.  Plaintiff Dep. at 274-75.

127.

Both Charge #1 and Charge #2 in the Second Notice of Removal
are considered "theft," such that termination would be the
consequence generally imposed by the USPS.  Hudson Dep. at 57.

128.

Other cases demonstrate that under the CBA, the USPS need
not provide progressive discipline to an employee who requests
and takes sick leave from the USPS and then subsequently works a
second job.  Complaint at B-17-B-18 (citing Cases No. FOIN-4F-D
090465949, KOOC-4K--D 06110539, and JQOC-IJ-D06002165).

129.

Other cases demonstrate that where an employee impermissibly
works a second job while on paid sick leave status with the USPS,
that employee's length of service is not a mitigating factor in
such a situation.  Complaint at B-17-B-18 (citing Cases No.
FOIN-4F-D 090465949, KOOC-4K--D 06110539, and JQOC-IJ-D06002165).

130.

The USPS's removal action against Plaintiff on the basis of
his working a second job while on sick leave status with the USPS
was taken for just cause under the terms of the applicable

Collective Bargaining Agreement.  Complaint at Exhibit B;
Norcross Dec. at ¶ 6.

131.

As it relates to Charge #2 of Plaintiff's Second Notice of
Removal, the USPS at all times complied with the terms of the
applicable Collective Bargaining Agreement.  Norcross Dec. at ¶
6.

132.

With regard to the Second Notice of Removal, the USPS at all
times complied with Article 15, Grievance-Arbitration Procedure,
of the Collective Bargaining Agreement.  Norcross Dec. at ¶ 7.

133.

The USPS, acting through its representatives, acted in good
faith observance of the principles and procedures set forth in
Article 15, Grievance-Arbitration Procedure, of the Collective
Bargaining Agreement.  Norcross Dec. at ¶ 8.

134.

The USPS, acting through its representatives, at all times
complied with Article 16, Discipline Procedures, of the
Collective Bargaining Agreement.  Norcross Dec. at ¶ 9.

135.

The USPS's action removing Plaintiff on the basis of the
finding that he was working a second job while on sick leave

34

status with the USPS as set forth in Charge #2 of the Second
Notice of Removal was taken for just cause under the terms of the
CBA.  Complaint at Exhibit B; Norcross Dec. at ¶ 10.

136.

The National Agreement between the USPS and the Union
provides that "All decisions of an arbitrator will be final and
binding."  CBA at Article 15.5.A.6, attached as <u>Exhibit A</u> to the
Norcross Dec.

This 5th day of October, 2010.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY


 /s/ Darcy F. Coty
DARCY F. COTY
ASSISTANT U.S. ATTORNEY
600 U.S. Courthouse
75 Spring Street, SW
Atlanta, Georgia 30303
(404)581-6043
Ga. Bar No. 259280
darcy.coty@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
                              :
OTIS G. WALKER,               :
                              :
    Plaintiff,                :
                              :    CIVIL ACTION
    vs.                       :
                              :    NO. 1:09-CV-2550-WSD
                              :
UNITED STATES POSTAL SERVICE  :
and AMERICAN POSTAL WORKERS   :
UNION, AFL-CIO, ATLANTA METRO,:
AREA LOCAL 32,                :
                              :
    Defendants.               :
                              :
```

## CERTIFICATE OF COMPLIANCE

I certify that the documents to which this certificate is attached have been prepared with one of the font and point selections approved by the Court in Local Rule 5.1B for documents prepared by computer.

This 5th day of October, 2010.

　　　　　　　　　　　　　　 /s/ Darcy F. Coty
　　　　　　　　　　　　　　DARCY F. COTY
　　　　　　　　　　　　　　ASSISTANT UNITED STATES ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
                               :
OTIS G. WALKER,                :
                               :
    Plaintiff,                 :
                               :   CIVIL ACTION
       vs.                     :
                               :   NO. 1:09-CV-2550-WSD
                               :
UNITED STATES POSTAL SERVICE   :
and AMERICAN POSTAL WORKERS    :
UNION, AFL-CIO, ATLANTA METRO, :
AREA LOCAL 32,                 :
                               :
    Defendants.                :
                               :
```

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this date electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney(s) of record:

Eric Croone

Matthew Boyd
Will Ellis
Hawkins & Parnell

Norman J. Slawsky

This 5th day of October, 2010.

    /s Darcy F. Coty
DARCY F. COTY
ASSISTANT UNITED STATES ATTORNEY