IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| OTIS G. WALKER, | ) | |
| | ) | |
|     Plaintiff, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO.: |
| | ) | 1:09-CV-2550-WSD |
| | ) | |
| UNITED STATES POSTAL | ) | |
| SERVICE and AMERICAN POSTAL | ) | |
| WORKERS UNION, AFL-CIO, | ) | |
| ATLANTA METRO AREA | ) | |
| LOCAL 32 | ) | |
| | ) | |
|     Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS ABOUT
WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

COMES NOW Plaintiff Otis G. Walker ("Plaintiff") and, pursuant to

Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby

files his Plaintiff's Statement of Material Facts About Which There Exists a

Genuine Issue To Be Tried,  and shows this Court as follows:

1.

Plaintiff  was a loyal, dedicated and hard-working employee of the

Postal Service for eighteen (18) years.  (Deposition of Plaintiff Otis G.

Walker "Plaintiff Dep.," at 249)(a true and correct copy of Plaintiff Dep. is attached hereto as Exhibit 1).

2.

By most accounts, Plaintiff was a "good worker" who interacted well with customers and received awards due to his dedication and customer service.  (Deposition of Carl Hudson "Hudson Dep.," at 74, a true and correct copy of which is attached hereto as Exhibit 2); and (Deposition of Emma Walker "Emma Walker Dep.," at 14, a true and correct copy of which is attached hereto as Exhibit 3).  ("The Union contends Mr. Walker is a good honest worker, with 18 years, and no prior discipline in his file.")(Plaintiff Dep., Ex. 7 at 3).

3.

Plaintiff was also a hard-worker, often logging numerous overtime hours and overtime pay beyond his normal salary.  (Plaintiff Dep. at 300).

4.

In or around February 2005, Plaintiff suffered a weight-lifting injury to his pectoral muscle.  The injury required major surgery to repair. (Plaintiff Dep. at 24, 31).

5.

Plaintiff was forced to take sick leave to recover from his surgery. (Plaintiff Dep. at 31).  Plaintiff was out of work until around April 2005. (Plaintiff Dep. at 31).

6.

Plaintiff later re-injured his arm in or around June, 2005.  Plaintiff was again placed on sick leave and told by his doctor not to do any heavy lifting. Plaintiff's Doctor advised him that he could return to light duty work on July 16, 2005, but that he could not return to regular duty work until August 16, 2005.  (Plaintiff Dep., at Ex. 1).

7.

As soon as he was eligible to, Plaintiff requested light duty work from his supervisor(s) at the Post Office.  (Plaintiff Dep. at 44).

8.

Plaintiff had been told by his Doctor that he could not lift over 20 pounds, yet regular duty Postal Service employees were required to be able to lift up to 70 pounds).  (Plaintiff Dep. at 34).

9.

Plaintiff was told by his supervisor that there was no light duty work available.  (Plaintiff Dep. at 46).

10.

Plaintiff was told to come back to work when he was 100% healthy.
(Plaintiff at 49-50).

11.

Around the same time in 2005, Plaintiff also worked a second job at a
Fairfield Inn hotel.  (Plaintiff Dep. at 41, 109-111).

12.

All of Plaintiff's supervisors knew that he had a second job.  (Plaintiff
Dep. at 50).  In fact many Postal Service employees, including Supervisor
Walker, held a second job.  (Emma Walker Dep. at 18).

13.

After Plaintiff was refused light duty work at the Post Office, he
continued to work his second job.  (Plaintiff Dep. at 170).

14.

Plaintiff had a good faith belief that he had actual, implied or tacit
approval to continue working his second job while out on sick leave.
(Compl., at ¶ 35-40).

15.

Moreover, Plaintiff never tried to conceal his second job from the
Postal Service, nor did he have any intentions of defrauding them in any

way.  "I wasn't stealing from the Post Office.  I followed the sick leave

procedure to the best of my knowledge.  I got hurt.  I tried to come back to

work.  I brought the paperwork.  They turned me away."  (Plaintiff Dep. at

278).

16.

It is undisputed that Plaintiff eventually returned to regular duty work

at the Postal Service.

17.

Everything changed for Plaintiff in 2006, when a new supervisor,

Emma Walker-Dudley ("Supervisor Walker") was assigned to his location at

the Pharr Road store.  According to Supervisor Walker, she was sent to

Pharr Road to deal with a so-called "situation of Mr. Walker not being in the

building at the time he was supposed to be there."  (Emma Walker Dep. at

9).

18.

Shortly after her arrival at the Pharr Road location, Plaintiff

voluntarily told Supervisor Walker that he worked a second job at a nearby

Fairfield Inn, including even once giving her a voucher for a discount stay at

the hotel.  (Emma Walker Dep. at 16, 18).

19.

Almost immediately thereafter, Supervisor Walker began accusing Plaintiff of working his second job at the Fairfield Inn while on Postal Service time.  (Emma Walker Dep. 16-20).

20.

In March 2006, after being at the Pharr Road store for only a few months, Supervisor Walker initiated her _first_ investigation of Plaintiff over her claims that he worked his second job while on Postal Service time. (Emma Walker Dep. at 27; Plaintiff Dep., Ex. 15 at 4).

21.

The next month, in April 2006, Plaintiff suffered a burn injury to his leg.  (Plaintiff Dep. at 61).  After going in to work and showing the injury to several co-workers, as well as to Supervisor Walker, Plaintiff was advised that he should seek medical attention. (_Id_.)(Supervisor Walker acknowledges seeing the burn spot on Plaintiff's leg, noting "the skin was kind of messed up."  (Emma Walker Dep. at 21)).

22.

Plaintiff advised Supervisor Walker that he needed to leave early to go to a doctor's visit.  After hearing this, Supervisor Walker told Plaintiff

that he "better not be working his second job while out on sick leave."

(Plaintiff Dep. at 62).

23.

Plaintiff was confused by Supervisor Walker's statement because he had no plans on going out on sick leave.   Plaintiff received outpatient treatment for the leg injury and was "in and out," returning to work the next day.  (Plaintiff Dep. at 62-64).

24.

Despite Plaintiff never missing time off of work for his 2006 injury, Supervisor Walker initiated a _second_ investigation against Plaintiff, claiming Plaintiff was working his second job while out on sick leave.  (Emma Walker Dep. at 25-26).

25.

In fact, Supervisor Walker now admits that "the investigation had started before [Plaintiff] actually went out on sick leave."  (Emma Walker Dep. at 26).

26.

With two investigations already ongoing, Supervisor Walker next sought to accelerate matters by bringing a _third_ investigation against

Plaintiff, a bogus claim that Plaintiff made a terroristic threat against her on April 22, 2006.  (Emma Walker Dep. at 32; First Notice of Removal).

27.

Supervisor Walker admitted that Plaintiff never made any statements directly to her, and that this claim was all based on hearsay.  (Emma Walker Dep. at 32)

28

In fact, Supervisor Walker had twisted Plaintiff's words to a close friend that "she was blowing things out of proportion" into an allegation that Plaintiff had threatened to "blow her away.")(Plaintiff Dep. at 70; *compare to* Emma Walker Dep. at 32).

29.

Finally, while the third investigation was just getting underway, Supervisor Walker made her _fourth_ and final claim against Plaintiff. Supervisor Walker conveniently construed Plaintiff's alleged statement to her to "not mess with me and my money" to mean a "threat of bodily harm to me." As a result, Supervisor Walker immediately ordered Plaintiff to leave the building and reported the matter to her superiors.  (Emma Walker Dep. at 33-35).

30.

Supervisor Walker knew that with her false allegations of Plaintiff making "terroristic threats" of "bodily harm," along with the Postal Service's so-called zero tolerance policy against workplace violence, that the Postal Service would move swiftly to get rid of Plaintiff.  (Emma Walker Dep. at 44).

31.

Sure enough, on April 25, 2006, Plaintiff was placed in an "emergency off duty status" and told not to return to work.  (Plaintiff Dep. at 78).

32.

To this day, Plaintiff has never been allowed to return to work. (Plaintiff Dep. at 302).

33.

By the time, on June 12, 2006, that the Office of Inspector General ("OIG") had concluded its 3 month review and issued its final report concerning the *first* investigation initiated by Supervisor Walker, the Postal Service was preparing to issue its First Notice of Removal, on June 13, 2006, involving the subsequent threat allegations.  (First Notice of Removal; Plaintiff Dep., Ex. 15).

34.

With the Plaintiff still off work since April 2006, the Postal Service and Plaintiff's Postal Union representatives dealt with the issue of the First Notice of Removal.  The parties determined that the allegations that Plaintiff made "terroristic threats" toward Supervisor Walker were completely false, and the First Notice of Removal against Plaintiff was vacated and back pay awarded, sometime likely around August 2006.  (Plaintiff Dep. at 102-103).

35.

However, just as the First Notice of Removal was being settled, the Postal Service issued the Second Notice of Removal on August 8, 2006. (Compl., at Ex. A).  The Second Notice of Removal included charges that Plaintiff (1) worked out at Crunch Gym while on Postal Service time; and (2) worked his second job while out on sick leave. (*Id).*

36.

Charge #1, which included the allegation that, in 2006, Plaintiff worked out at Crunch Gym while on Postal Service time, was dismissed by the arbitrator and is not the subject of this suit.  (Compl.; Compl., at Ex. B).

37.

Charge #2 included the allegation that Plaintiff worked his second job while out on sick leave.  However, despite the fact that the investigation was

initiated by Supervisor Walker in 2006, 17 of the 18 dates included in the charge occurred in 2005, prior to Supervisor Walker ever working with Plaintiff.  (Compl., at Ex. A-2).

38.

In fact, the only date that Supervisor Walker would have had knowledge of and could have testified on, April 15, 2006, was never included in the OIG Report as a date that Plaintiff worked his second job while out on sick leave.  (Plaintiff Dep., Ex. 15 at 4).  Indeed, the April 15, 2006 date inclusion in Charge #2 of the Second Notice of Removal was a complete and utter fabrication by the Postal Service.

39.

In the final analysis, after the *four* different investigations brought by Supervisor Walker against Plaintiff, what remained was one (1) charge of working a second job while out on sick leave, which as far as Supervisor Walker was concerned was based on a single date, April 15, 2006, that turns out to be a complete fabrication and should have never been included in the Second Notice of Removal.  (Compl., at Ex. A).

40.

From the start, Plaintiff took the charges against him very seriously. In fact, Plaintiff "wanted legal representation from the very beginning."

11

(Plaintiff Dep. at 180).  However, Plaintiff was "told I had to go to the Union.  I can't bring in my own attorney or own legal representation." (Plaintiff Dep. at 80).  As a result of their position as his exclusive advocates during the grievance process, Plaintiff felt the Postal Union had an "obligation" to put forth a good faith effort on his behalf.  (Plaintiff Dep. at 89-90).

41.

Accordingly, in connection with the Second Notice of Removal, Plaintiff sought and received the assistance of the Postal Union in filing an appeal.  Throughout the initial grievance processes, Plaintiff was represented by Clerk Craft Director, Malinda Hunter ("Hunter") and former Vice President, Ralph Brown ("Brown").  (Plaintiff Dep. at 134).

42.

During the initial investigations conducted by the Postal Service and the Office of Inspector General ("OIG"), Plaintiff was advised by both Brown and Hunter to not answer any questions.  As the records reflect, on one such occasion, "the grievant and union representative Ralph Brown met with special agents with the OIG on May 30, 2006 at the APWU union hall regarding the investigation.  The grievant was advised of his KalKine Right and given an opportunity to respond to questions, but under the advice of

Mr. Brown, the grievant refused to answer any questions or cooperate.  The interview was subsequently terminated."  (Plaintiff Dep., Ex. 9 at 2).

43.

On another occasion, "an investigative interview was conducted with [Plaintiff] and your Union Representative, Malinda Hunter, on July 18, 2006, relative to the allegations outlined in the OIG report.  You were asked several questions pertaining to the report data, your knowledge of Postal Service rules and regulations governing employee conduct, your cooperation in postal investigation and your request for and payment for sick leave while receiving earnings from another employer.  You gave the same response to each question, "I choose not to respond."  (Plaintiff Dep., Ex. 6 at 3).

44.

As Plaintiff recalled, "me and Ms. Hunter went out to the Northside carrier facility…[and] that's when she told me not to say anything." (Plaintiff Dep. at 113).  Plaintiff admitted, "I just followed her lead." (Plaintiff Dep. at 85).

45.

The Postal Union's advice to Plaintiff not to cooperate (1) effectively precluded any opportunity to have the charges against him resolved at an earlier stage in the grievance process; (2) constituted a violation of Postal

Service rules;  and (3) appeared to prejudice Plaintiff's claim in the eyes of Arbitrator Cannavo.  (Plaintiff Dep. at Ex. A-3; Plaintiff Dep. at Ex. B-6-B-19)(noting that because Plaintiff "never answered questions…Management was forced to rely on the information provided by the OIG.").

46.

Still, despite obvious shortcomings in her representation, Plaintiff felt "[Hunter] was doing the best that she could with what limitations she had." (Plaintiff Dep. at 118).

47.

Hunter and Brown were unsuccessful in getting the Second Notice of Removal dismissed and the matter proceeded to arbitration in January, 2008 ("First Arbitration Hearing").  (Plaintiff Dep. at 144).

48.

During the First Arbitration Hearing, Plaintiff was represented by Brown, as Hunter, who was more familiar with the case, was not certified as an advocate.  (Plaintiff Dep. at 146, 132; Defendant Postal Union's Response to Plaintiff's First Set of Interrogatories, at ¶ 6).

49.

Following the conclusion of the First Arbitration Hearing, the arbitrator became ill and never rendered a final decision.  (Plaintiff Dep. at 147).

50.

Eventually, the case was set for another arbitration hearing in January 6, 2009 ("Second Arbitration Hearing").  (Hudson Dep. at 20).

51.

According to the Postal Union, Brown and Hunter were no longer available to represent Plaintiff.  (Hudson Dep. 17-19).

52.

For the Second Arbitration Hearing, Plaintiff was represented by Carl Hudson ("Advocate Hudson") (Hudson Dep. at 13, 20).

53.

Plaintiff immediately got the feeling that his case was thrown to Advocate Hudson at the last minute.  (Plaintiff Dep. at 182)("The date was like 30 days out, and then I met with Mr. Carl Hudson, and they kind of just threw this in his lap."  (Plaintiff Dep. at 153)).

54.

Indeed, when asked during his deposition how much time he spent on Plaintiff's case, Advocate Hudson's response varied wildly between "several" hours to "24-48 hours."  (Hudson Dep. at 21-23).

55.

In fact, Advocate Hudson only met with Plaintiff to discuss the case a "couple of times."  (Plaintiff Dep. at 157).

56.

During their brief discussions about the case, Plaintiff pleaded with Advocate Hudson to contact character witnesses and other witnesses on his behalf.  (Plaintiff Dep. at 160-161).  As Plaintiff stated, "I was highly wanting co-workers to come and, you know, testify on my behalf." (Plaintiff Dep. at 166).  Plaintiff felt testimony from his co-workers was needed to "dispute these paper documents, because what's necessarily on paper is not necessarily true."  (Plaintiff Dep. at 160-161).

57.

Advocate Hudson refused to interview or solicit testimony from any character witnesses, co-workers, or former supervisors on Plaintiff's behalf. (Hudson Dep.  at 25, 35).

58.

Advocate Hudson responded to Plaintiff's requests for witnesses by telling Plaintiff that he "didn't need that" because "the burden of proof is on the Postal Service."  (Plaintiff Dep. at 124, 189).

59.

The only person that Advocate Hudson contacted was Mateo Smith ("Smith"), a union steward at the Pharr Road location.  (Hudson Dep. at 65). Advocate Hudson called Smith to "find out what's going on in the Pharr Road facility."  (Hudson Dep. at 66).

60.

According to Advocate Hudson, it was Smith's opinion that the charges against Plaintiff were true.  When Advocate Hudson was asked if he believed Smith and that the charges against Plaintiff were true, he also replied, "yes."   (Hudson Dep. at 67).

61.

Advocate Hudson appeared to have predetermined Plaintiff's guilt. (Hudson Dep. at 67-68).

62.

Going forward, Advocate Hudson did almost no independent investigation or research on Plaintiff's case.  (Hudson Dep. at 26).  He relied

almost exclusively on the case file as presented to him by Ralph Brown and on Ralph Brown's impressions of the case.  (Hudson Dep. at 27).

63.

Plaintiff also repeatedly asked Advocate Hudson to get copies of the so-called POS reports.  (Plaintiff Dep. at 118).  Plaintiff wanted the POS reports because "that would have showed I worked an eight-hour day and took my hour lunch break."  (Plaintiff Dep. at 123).

64.

According to Advocate Hudson, "the POS system itself is what records all the transactions that are handled on a particular window, a sales service associate, or sales service terminal."  (Hudson Dep. at 29).

65.

That information would have been critical to Plaintiff's case, especially as it relates to the charges of Plaintiff working out at Crunch Gym or working his second job while on Postal Service time.  (Plaintiff Dep. at 276-277).

66.

Despite Advocate Hudson understanding the importance of the POS reports, when asked why he never obtained the records, he provided alternate excuses of (1) he "assume [the OIG] would have had all the

information"; (2) that Malinda Hunter should have gotten the POS reports;

and (3) that somehow "new evidence" rules prevented him from requesting

the reports.  (Hudson Dep. at 29-32).

67.

As to other evidence in the case, the Postal Service twisted the facts

contained in the OIG Report to claim that Plaintiff work his second job

while out on sick leave on April 15, 2006.  They included this fabricated and

completely bogus information in the Second Notice of Removal.  (Compl.,

at Ex. A).

68.

This bogus fact seemed to dovetail nicely with Supervisor Walker's

purported "warning" to Plaintiff not to work his second job while out on sick

leave prior to April 15, 2006.  (Plaintiff Dep. at 62).

69.

The Postal Service made it appear that Plaintiff had ignored

Supervisor Walker's warning and worked his second job while out on sick

leave on April 15, 2006.  (Compl., at Ex. A).

70.

Advocate Hudson failed to thoroughly review the documents in the

case, including the OIG Report and the Second Notice of Removal.  This

allowed a crucial piece of erroneous and fabricated evidence to go

unchallenged.  Arbitrator Cannavo made the impact of that evidence clear:

> "The Arbitrator credits the testimony of Supervisor
> Walker.  She testified that she made several open and
> notorious efforts to get the Grievant to stop using Postal
> time to work at his second job....Thus, if Grievant truly did
> not have prior notice of the prohibition against working a
> second job while on sick leave, he certainly had sufficient
> notice to correct the situation, given Supervisor Walker's
> credible and unrebutted testimony."  (Compl., at Ex. B-
> 16).

### 71.

There is nothing in the Arbitration Award to suggest that Advocate

Hudson challenged any of the documents presented by the Postal Service,

despite there being serious questions about their content and proper

authentication.  (Compl., at Ex. B).

### 72.

As a final blow to Plaintiff's chances, instead of preparing a final

written brief at the conclusion of the arbitration hearing, Advocate Hudson

decided to go with an extemporaneous presentation that he never practiced.

(Hudson Dep. at 69-70).  As Advocate Hudson later admitted, "doing a written closing instead of an oral closing to the arbitrator…would have gave me time to truly think about all the different pros and cons of the case." (Hudson Dep. at 70).

73.

Plaintiff stated that prior to having to go through the grievance process he was not a member of the Postal Union.  (Plaintiff Dep. at 286).

74.

Plaintiff was forced to sign up for membership as a condition of the Postal Union's representation of him at the arbitration hearing.  As Plaintiff recalled, "I mean, I think I had to sign up or something.  I had to sign something to where I would have been  -- I would have been a member, I guess, if I gotten my job back."  (*Id.*).

75.

And while the dues paying membership status of an employee is not information normally available to an advocate, Advocate Hudson was keenly aware.  As he pointed out, "I am, but most are not" aware of whether the person being representing is a dues paying member.  (Hudson Dep. at 45).  In fact, Advocate Hudson had special knowledge and a vested interest

in such information, because as he proudly proclaimed, "I'm secretary-treasurer. Membership comes through me." (Hudson Dep. at 46).

76.

Advocate Hudson's and the Postal Union's representation of Plaintiff was discriminatory, dishonest, arbitrary or perfunctory, and was a breach of the Postal Union's duty of fair representation. (*See generally*, Compl.).

77.

The Postal Service breached the terms of the CBA by (1) failing to follow its own disciplinary procedures and due process; (2) by not working to resolve their grievance with Plaintiff at the lowest possible levels; (3) by acting in bad faith and intentionally infecting the grievance process with fabricated evidence; (4) by making Plaintiff's discipline punitive and not corrective; and (5) by failing to consider any mitigating factors in Plaintiff's favor. (*Id*.)


This 29th day of October, 2010.


Respectfully submitted,


/s/Eric Croone
Eric Croone, Esq.
Georgia Bar No. 197645
Attorney for Plaintiff

E. Croone & Associates, LLC
3355 Lenox Road
Suite 750
Atlanta, GA 30326
404-313-2015
404-262-0651 facsimile
Email: ecroone@aol.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that an electronic copy of the foregoing document was

served upon the following counsel of record via the Court's CM/ECF

system.

       Darcy F. Coty
       Assistant U.S. Attorney
       600 U. S. Courthouse
       75 Spring Street, SW
       Atlanta, Georgia 30303

       Matthew Boyd
       Willie Ellis, Jr.
       Hawkins & Parnell, LLP
       4000 SunTrust Plaza
       303 Peachtree Street, N.E.
       Atlanta, Georgia 30308-3243

       Norman J. Slawsky
       Jacobs & Slawsky
       315 W. Ponce de Leon Ave.
       Suite 850
       Decatur, GA 30030

This 29th day of October, 2010.

       <u>/s/Eric Croone</u>
       Eric Croone, Esq.
       Georgia Bar No. 197645
       Attorney for Plaintiff

E. Croone & Associates, LLC
3355 Lenox Road
Suite 750
Atlanta, GA 30326